IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


KENNETH J. FLETCHER,

        Plaintiff,

   vs.                           Civil Action 2:07-CV-325

                                      Magistrate Judge King

DEPUTY ROBERT K. VANDYNE,
*et al.*,

        Defendants.


<u>OPINION AND ORDER</u>

This is a civil rights action in which plaintiff, a state inmate, alleges that defendants, Muskingum County ("the County") and officers of the Muskingum County Sheriff's Office, acted in contravention of 42 U.S.C. § 1983 when they violated his constitutional rights while he was housed at the Muskingum County Jail ("MCJ"). Specifically, plaintiff alleges that he was subjected to excessive force and was denied medical treatment. Plaintiff also alleges that the County failed to properly train its employees and that the alleged deprivations resulted from the County's customs and policies. Plaintiff also asserts a claim under Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. § 2000cc-1. Finally, plaintiff asserts a supplemental state common law claim of battery. With the consent of the parties, 28 U.S.C. § 636(c), this matter is before the Court on the *Motion for Summary Judgment by Muskingum County Defendants*, Doc. No. 34 ("*Motion for Summary Judgment*"). For the reasons that follow, the *Motion for Summary Judgment* is **GRANTED** in part and **DENIED** in part.

## I.     BACKGROUND

### A.     Plaintiff's Incarceration

In February 2006, plaintiff was transferred from the Ross Correctional Institution ("RCI") to the MCJ in connection with criminal charges pending against him in Muskingum County. *Deposition of Kenneth Fletcher*, pp. 15-18, 78, 81-82, Doc. No. 35 ("*Plaintiff Depo.*"); *Amended Complaint*, ¶ 18, Doc. No. 3 ("*Am. Comp.*").

### B.     Plaintiff's Religious Affiliation and Easter Sunday

Consistent with his religion, Islam, plaintiff does not eat pork products. *Am. Comp.* ¶¶ 19, 21-22.  On April 16, 2006, Easter Sunday, plaintiff believed, based on reports from an unidentified inmate, that he had been served a pork-based product. *Plaintiff Depo.*, pp. 33-36. Plaintiff was assured by jail officials that the meat was turkey-based. *Id.* However, plaintiff did not taste the meat. *Id.* at 39-40. Instead, he traded his food tray for a telephone card. *Id.*

### C.     Discussion Regarding Lunch Meat on April 21, 2006

MCJ contains an area known as the "Center Range," which is a segregation area located on the fourth floor[1] where inmates are housed for disciplinary purposes. *Id.* at 8, 12; *Deposition of Robert Keith VanDyne*, pp. 16, 18, Doc. No. 38 ("*Van Dyne Depo.*").  On approximately April 20, 2006, plaintiff was placed in the Center Range in connection with a rule violation. *Plaintiff Depo.* at 8-13, 23-24, 26.[2] On April

---

[1]In addition, although a range of inmates are housed on the fourth floor, it is generally used for inmates accused of violent felonies or violent misdemeanors. *Deposition of Robert Keith Van Dyne*, pp. 17-18, Doc. No. 38; *Deposition of Sergeant John Lang*, pp. 16-17, Doc. No. 36.

[2]Prior to April 20, 2006, plaintiff had been disciplined for other infractions and housed in the Center Range on other occasions. *Id.* at 23-25.

21, 2006, plaintiff pressed an intercom button in his cell, cell 457, to speak about the lunch tray that he had received. *Id.* at 37; *Van Dyne Depo.*, p. 9. When defendant Deputy Robert Van Dyne answered the call, plaintiff advised the deputy that plaintiff was Muslim and did not eat pork. *Plaintiff Depo.*, pp. 30-32, 38; *Van Dyne Depo.*, pp. 5, 9. Still on the intercom, defendant Van Dyne advised plaintiff that all meat served to him was turkey-based. *Plaintiff Depo.*, pp. 30-32, 38; *Van Dyne Depo.*, pp. 9, 14. Plaintiff did not believe the deputy and said that he did not want to eat "fucking pork." *Plaintiff Depo.*, pp. 38-39, 44; *Van Dyne Depo.*, p. 9. Defendant Van Dyne repeated that the meat was turkey, not pork. *Van Dyne Depo.*, p. 9.

### D. Altercation Inside and Around Plaintiff's Cell

Shortly after this discussion, defendant Van Dyne heard a tray slam onto the floor in the Center Range. *Id*. at 9-10. He looked through a window and saw a lunch tray lying near plaintiff's cell. *Id*. at 9-10, 18; *Plaintiff Depo.*, pp. 42-43. Defendant Van Dyne called for assistance and asked that someone bring a taser. *Van Dyne Depo.*, pp. 10, 18; *Plaintiff Depo.*, p. 44; *Deposition of Sergeant John Lang*, p. 14, Doc. No. 36 ("*Lang Depo.*"). Defendant Van Dyne did not speak with plaintiff or ask him what happened before calling for assistance. *Van Dyne Depo.*, p. 19; *Plaintiff Depo.*, pp. 44, 46. Defendant Van Dyne presumed that plaintiff had thrown his tray. *Van Dyne Depo.*, p. 24.

Defendant Sergeant John Lang, defendant Deputy Jim Paxton, defendant Officer Don Rice and defendant Deputy Duemmle responded to defendant Van Dyne's request for assistance. *Van Dyne Depo.*, pp. 10,

19; *Lang Depo.*, pp. 14-15.  Upon their arrival, defendant Van Dyne advised the others that plaintiff had thrown his tray to the floor. *Van Dyne Depo.*, p. 25; *Lang Depo.*, pp. 15-16.

Defendant Van Dyne, with assistance from the others, walked to plaintiff's cell.  *Van Dyne Depo.*, pp. 10, 26; *Lang Depo.*, p. 15; *Plaintiff Depo.*, p. 46.  Defendant Van Dyne instructed plaintiff to exit the cell and to clean up the food tray on the floor.  *Van Dyne Depo.*, pp. 10, 19; *Lang Depo.*, p. 18; *Plaintiff Depo.*, pp. 45-48. Plaintiff refused, saying "F that, I ain't cleaning up shit" and telling defendant Van Dyne to "fuck himself or something."  *Van Dyne Depo.*, p. 19; *Lang Depo.*, p. 18; *Plaintiff Depo.*, pp. 45-48. Defendant Van Dyne again instructed plaintiff to exit the cell.  *Van Dyne Depo.*, pp. 10, 19; *Plaintiff Depo.*, pp. 45-48.  Plaintiff denied throwing the tray.  *Van Dyne Depo.*, pp. 19, 28.  Plaintiff again refused to leave his cell, saying that "it was my right if I wanted to come out.  I wanted to choose to stay in my cell."  *Van Dyne Depo.*, pp. 10, 19; *Plaintiff Depo.*, p. 46.

Defendants Van Dyne and Duemmle attempted to escort plaintiff out of his cell.  *Van Dyne Depo.*, pp. 28-29; *Lang Depo.*, p. 19; *Plaintiff Depo.*, p. 49.  Plaintiff resisted those attempts, backing further into his cell.  *Van Dyne Depo.*, p. 29; *Lang Depo.*, pp. 18-19; *Plaintiff Depo.*, p. 52.  Defendants Van Dyne and Duemmle attempted to carry plaintiff out of the cell, but plaintiff broke free of their grasp and pushed past defendants Lang and Paxton, bumping or shoving them out of his way.  *Van Dyne Depo.*, pp. 29-31, 36, 68; *Lang Depo.*, pp. 20-23; *Plaintiff Depo.*, p. 50.

Once outside the cell, plaintiff grabbed a row of steel bars

4

separating the Center Range from a walkway. *Van Dyne Depo.*, pp. 28-32; *Lang Depo.*, p. 23; *Plaintiff Depo.*, p. 50. Plaintiff was ordered at least once to release the bars. *Lang Depo.*, p. 23; *Plaintiff Depo.*, p. 50. Plaintiff refused to do so, actively resisting while defendants attempted to pry his grip from the bars. *Lang Depo.*, p. 23; *Plaintiff Depo.*, pp. 50, 52, 55. Plaintiff testified that defendants grabbed his neck and tried to pull him off the bars and tried to "slam" him. *Plaintiff Depo.*, p. 54. Plaintiff admits that he shoved defendants during the altercation, but insists that he did not punch or spit at defendants. *Id*. at 57. After about ten minutes, defendants managed to briefly remove plaintiff's hands from the bars, but plaintiff was able to "regroup" and "re-grab" the bars and "hold on tighter." *Id*. at 54, 58-59.

Defendant Van Dyne warned plaintiff that the taser would be used unless plaintiff released his hold on the bars. *Van Dyne Depo.*, p. 37; *Lang*, pp. 23-24; *Plaintiff Depo.*, pp. 50-51. Plaintiff refused to comply. *Lang Depo.*, pp. 23-24; *Plaintiff Depo.*, pp. 50-51, 55. Defendant Van Dyne then tasered plaintiff, who was still clinging to the bars. *Van Dyne Depo.*, pp. 37-38; *Lang Depo.*, pp. 23-26; *Plaintiff Depo.*, pp. 54-56.

"A 'taser' is an electronic device used to subdue violent or aggressive individuals. By pressing a lever, a high voltage electrical current is transmitted through a wire to the target." *Nicholson v. Kent County Sheriff's Dep't*, 839 F. Supp. 508, 515 n.4 (W.D. Mich. 1993). The taser affects only the targeted person; it does not affect anyone else touching that person. *Van Dyne Depo.*, pp. 47-48. Taser model M-26, the model used by defendants, has two

capabilities: (1) shooting darts that administer an electric shock to the target, and (2) simply touching the target without employing the darts, known as the "drive-stun" mode. *Id*. at 38. Both methods deliver the same shock level and are equally easy to administer. *Id*. at 39. However, the first method requires that the user attach a cartridge containing the darts. *Id*. at 39-40.

Because defendant Van Dyne did not immediately realize that the cartridge was on the gun, he used the dart method rather than the drive-stun method, deploying darts or probes into plaintiff. *Van Dyne Depo.*, pp. 38-40. That application had little apparent effect on plaintiff. *Id*. at 41-42; *Lang Depo.*, pp. 29-30. Plaintiff tensed up, but continued holding onto the metal bars. *Id.*; *Plaintiff Depo.*, p. 60.

Defendant Van Dyne removed the dart cartridge from the taser and administered a second shock. *Van Dyne Depo.*, pp. 42-43. He employed the stun method (*i.e.,* without the prongs) by pressing the taser against a large muscle mass in plaintiff's side. *Id*. at 42-43, 45. The second taser shock also had little apparent effect on plaintiff. *Id*. at 42, 45; *Lang Depo.*, pp. 34-35; *Plaintiff Depo.*, p. 60. Defendant Van Dyne administered a third shock, which again only minimally affected plaintiff's behavior. *Van Dyne Depo.*, pp. 42, 45; *Plaintiff Depo.*, p. 60. As defendant Van Dyne applied a fourth shock, plaintiff twisted, causing the taser to strike defendant Van Dyne in the forearm. *Id*. at 42, 46-47. Defendant Van Dyne "felt just a little tingle" and concluded that the taser was not working properly. *Id*. at 42, 46, 48-49. Plaintiff testified that the taser gun was "ineffective." *Plaintiff Depo.*, p. 55. Plaintiff continued

holding onto the bars and struggling for an additional ten minutes before defendants pried his fingers from the jail bars. *Id*. at 58-59.

Plaintiff estimated that the taser was applied six times. *Plaintiff Depo.,* p. 51.

Muskingum County Sheriff's Department's procedures require that any injuries to an inmate be photographed as soon as possible after they occur. *Van Dyne Depo.*, p. 66; *Lang Depo.*, p. 41. No photographs were taken that day of the areas on plaintiff's body that the taser had touched. *Van Dyne Depo.*, pp. 55-56; *Lang Depo.*, pp. 41-42.

**E. The Restraint Chair**

After plaintiff's hold on the bars was broken, defendants escorted or carried plaintiff downstairs to a restraint chair in the booking area on the first floor. *Van Dyne Depo.*, pp. 49-50; *Lang Depo.*, pp. 30-31; *Plaintiff Depo.*, p. 59. Plaintiff has no recollection of walking to the restraint chair. *Id.* A restraint chair is a device used by corrections facilities to handle violent inmates. *Van Dyne Depo.*, pp. 56-57. Straps around the upper torso and a lap belt hold the inmate's body against the chair. *Id*. The inmate's arms and legs can also be strapped down, preventing the inmate from punching or kicking. *Id.* If an inmate spits at corrections officers, a "spit hood" may be placed over the inmate's head. *Id*.

Defendant Lang decided to place plaintiff in the restraint chair instead of a holding cell because he believed that plaintiff was combative and resistant to commands. *Van Dyne Depo.*, pp. 31-32. Neither defendant Van Dyne nor defendant Lang examined plaintiff for injuries before placing him in the chair at approximately 12:00 p.m.

*Lang Depo.*, pp. 32, 34, 39-40; *Plaintiff Depo.*, p. 59.  Medical personnel did not examine plaintiff for injuries before plaintiff was placed in the chair.  *Lang Depo.*, pp. 33-34.

At approximately 1:30 p.m., defendant Major Terry Newman, MCJ's Major and Jail Administrator,[3] heard loud shouting coming from the booking area.  *Deposition of Terry Franklin Newman*, pp. 25-26, 52, Doc. No. 39 ("*Newman Depo.*"); *Newman Aff.* ¶¶ 11-12.  Defendant Newman went to investigate and saw plaintiff, shouting and using vulgar language, in the restraint chair.  *Newman Depo.*, p. 26; *Newman Aff.* ¶ 13.  Defendants Lang and Paxton were present in the booking area.  *Newman Depo.*, p. 29.  Defendant Lang told Defendant Newman that plaintiff had thrown a food tray, had refused to leave his cell and had been tasered as a result.  *Newman Depo.*, pp. 26, 29.

Shortly thereafter, plaintiff calmed down and assured defendant Newman that plaintiff would control himself.  *Id*. at 52-53.  Defendant Newman asked someone, possibly defendant Paxton, to release plaintiff from the restraint chair.  *Id*. at 53.  Defendant Newman then spoke with plaintiff for 20 to 30 minutes.  *Id*. at 59.  Plaintiff told defendant Newman that "I didn't do anything," but "they [defendants Van Dyne, Lang, Duemmle, Paxton and Rice] fucked me up."  *Id*. at 27.  Plaintiff did not deny throwing the tray.  *Id*. at 53.  He also complained that he had been served pork even though he was Muslim.  *Id*. at 27, 53-54; *Newman Aff.* ¶ 14.  Defendant Newman advised plaintiff that all meat served at MCJ is turkey based.  *Id*.  Plaintiff

---

[3]Defendant Newman has served as the Training Coordinator for the Muskingum County Sheriff's Office since January 2007.  *Affidavit of Terry Newman*, ¶ 2, attached as Exhibit 6 to *Motion for Summary Judgment* ("*Newman Aff.*").

further complained that defendant Deputy Erin Fuller had been disrespectful to him, telling him that "he was a black man trapped in a white man's body" and that she did not like him. *Newman Depo.*, p. 55. Defendant Newman advised that he would speak to defendant Fuller's supervisor about her alleged comments.[4] *Newman Depo.*, p. 57.

Plaintiff remained agitated even after his discussion with defendant Newman. *Id*. at 59. Defendant Newman warned plaintiff to calm down or he would be placed back in the chair. *Id*. Plaintiff responded, "I don't give a fuck," and became very loud and "very obnoxious with his language." *Id*. Plaintiff had been returned to the restraint chair by the time defendant Newman left the booking area. *Id*. Plaintiff made no mention, in his deposition, of a conversation with defendant Newman or of any interim release from the restraint chair. Defendant Lang testified that plaintiff was restrained in the chair for a total of four hours. *Lang Depo.*, pp. 32-33. Plaintiff testified that he spent six hours in the chair. *Plaintiff Depo.*, pp. 59-60. In total, plaintiff spent approximately four to six hours in the chair.

### F. Defendant Van Dyne's Report

After plaintiff had been removed from the Center Range and taken to the booking area, defendant Van Dyne began working on a use of force report, which summarized the incident involving plaintiff.[5] *Van*

---

[4]Defendant Newman in fact later spoke with defendant Fuller's supervisor, Sergeant Smith. *Newman Depo.*, p. 57. Defendant Fuller denied the incident reported by plaintiff. *Id*.

[5]Inexplicably, this report is not attached to any deposition filed with the Court and no party filed a copy of the report with the Court.

*Dyne Depo.*, pp. 50-51.[6]  When answering whether or not the taser

operated satisfactorily, defendant Van Dyne answered "yes."  *Id.* at

61-62; *Lang Depo.*, pp. 37-39.  Although he did not personally examine

plaintiff for injuries, defendant Van Dyne indicated on the report

that the taser had not caused injury to plaintiff.  *Van Dyne Depo.*,

pp. 62-63.  Defendant Van Dyne gave the use of force report to his

supervisor, who was to forward it to the Jail Administrator and Chief

Deputy.  *Van Dyne Depo.*, pp. 54-55.  Defendant Lang signed the report,

indicating that he was aware that a taser had been used and that he

had reviewed the form for accuracy.  *Lang Depo.*, pp. 36-37.

Defendant Van Dyne also completed another form, the violation

notification.  *Van Dyne Depo.*, pp. 51-52.[7]  He identified plaintiff's

infraction as "[d]isruptive jail activities, meal service."  *Id.*


### G.    Photographs Taken of Taser Injuries

On April 22, 2006, Joshua Whiteman, MCJ's Supervisor, responded

to plaintiff's request to discuss a complaint.  *Affidavit of Joshua

Whiteman*, ¶¶ 2-4, attached as Exhibit 1 to *Motion for Summary Judgment*

("*Whiteman Aff.*"); Exhibit A, attached to *Whiteman Aff.*  Plaintiff

showed Supervisor Whiteman injuries allegedly caused by the taser.

*Whiteman Aff.* ¶ 5; *Whiteman Aff.* Exh. A.  Supervisor Whiteman did not

believe that the wounds were infected or required medical attention.

---

[6]According to defendant Van Dyne, each of the other defendants involved
in this incident also wrote a narrative summary.  *Van Dyne Depo.*, p. 51.  No
narrative summaries authored by other defendants were filed with this Court.

[7]Again, although defendant Van Dyne testified about this document in his
deposition, it was not attached to the deposition.  Similarly, no party filed
a copy with the Court.

*Whiteman Aff*. ¶ 6.

Plaintiff requested that pictures be taken of the injuries because no one had yet photographed the injuries. *Whiteman Aff*. Exh. A. Supervisor Whiteman returned to the booking area and reviewed the incident reports, which confirmed that no one had photographed plaintiff's injuries. *Id*. Supervisor Whiteman telephoned defendants Lang and Van Dyne regarding the incident, but was unable to reach either defendant. *Id*. Lieutenant Wilson instructed Supervisor Whiteman to photograph plaintiff's injuries. *Id*. Supervisor Whiteman returned to plaintiff's cell and took four pictures of plaintiff's wounds. *Id*.

### H.    The Instant Litigation

Plaintiff filed "at least five grievances" regarding the April 21, 2006, incident. *Plaintiff Depo.*, pp. 73, 77.[8] On April 16, 2007, plaintiff filed the instant action. *Complaint*, Doc. No. 1. On May 3, 2007, plaintiff filed an *Amended Complaint*. In addition to naming Muskingum County, Ohio, as a defendant, plaintiff has sued eight individuals in their individual and official capacities.[9] As discussed *supra*, plaintiff asserts claims of excessive force, denial of medical treatment, failure to train and unconstitutional customs and policies, a claim under RLUIPA and a supplemental claim of common law battery.

## II.   STANDARD

The standard for summary judgment is well established. This

---

[8]The parties did not file copies of any of these grievances. The record does not reflect the disposition of the grievances.

[9]As noted *supra*, plaintiff has sued defendants Van Dyne, Lang, Paxton, Duemmle, Rice and Newman. Plaintiff has also named Deputy Erin Fuller and Sheriff Robert J. Stephenson as defendants. *Am. Comp*.

standard is found in Rule 56 of the Federal Rules of Civil Procedure,
which  provides in pertinent part:

> The judgment sought shall be rendered if the
> pleadings, discovery and disclosure materials on
> file, and any affidavits show that there is no
> genuine issue as to any material fact and that
> the movant is entitled to judgment as a matter of
> law.

Fed. R. Civ. P. 56(c).  Pursuant to Rule 56(c), summary judgment is
appropriate if "there is no genuine issue as to any material fact . .
. ."  *Id*.  In making this determination, the evidence "must be viewed
in the light most favorable" to the non-moving party.  *Adickes v. S.H.
Kress & Co.*, 398 U.S. 144, 157 (1970).  Summary judgment will not lie
if the dispute about a material fact is genuine, "that is, if the
evidence is such that a reasonable jury could return a verdict for the
non-moving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986).  However, summary judgment is appropriate if the opposing
party "fails to make a showing sufficient to establish the existence
of an element essential to that party's case, and on which that party
will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*,
477 U.S. 317, 322 (1986).  The "mere existence of a scintilla of
evidence in support of the [opposing party's] position will be
insufficient; there must be evidence on which the jury could
reasonably find for the [opposing party]."  *Anderson*, 477 U.S. at 252.

The "party seeking summary judgment always bears the initial
responsibility of informing the district court of the basis for its
motion, and identifying those portions" of the record which
demonstrate "the absence of a genuine issue of material fact."
*Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the

nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). "Once the moving party has proved that no material facts exist, the non-moving party must do more than raise a metaphysical or conjectural doubt about issues requiring resolution at trial." *Agristor Fin. Corp. v. Van Sickle*, 967 F.2d 233, 236 (6th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III. DISCUSSION

### A. Excessive Use of Force Claims (Counts 1, 2, 11, 12, 19, 20)

#### 1. Section 1983

Plaintiff asserts claims of excessive force under 42 U.S.C. § 1983.[10] To state a colorable claim under Section 1983, a plaintiff must allege the violation of a right secured by the federal constitution or laws by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). To succeed on a claim for a violation of § 1983, a plaintiff must show that (1) a person (2) acting under color of state law (3) deprived him or her of his or her rights secured by the United States Constitution or its laws. *See*

---

[10]Section 1983 provides in relevant part:

Every person who under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

42 U.S.C. § 1983.

*Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001).

Because § 1983 is a method for vindicating federal rights, and is not itself a source of substantive rights, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994).

### 2. Plaintiff's status and applicable standard

In this case, plaintiff argues that defendants' actions constituted excessive force in violation of his rights under the Eighth and/or Fourteenth Amendments to the United States Constitution. *Am. Comp.* ¶¶ 32-42, 92-102, 139-150. The United States Court of Appeals for the Sixth Circuit has held that, as it pertains to such claims, "'[w]hich amendment applies depends on the status of the plaintiff at the time of the incident, whether free citizen, convicted prisoner, or something in between.'" *Lanman v. Hinson*, 529 F.3d 673, 680 (6th Cir. 2008) (quoting *Phelps v. Coy*, 286 F.3d 295, 299 (6th Cir. 2002)). The Eighth Amendment deliberate indifference standard applies if the plaintiff was a convicted prisoner at the time of the incident, while the Fourteenth Amendment's due process clause applies if the plaintiff was a pretrial detainee at the relevant time. *Id.* at 680-81.

The parties disagree on plaintiff's status at the time of the incident and, therefore, on the applicable standard. Plaintiff argues that he was a pretrial detainee who, under the Fourteenth Amendment, "cannot be punished," but he offers no support for this contention. *Plaintiff's Memorandum Contra to the Motion for Summary Judgment by Muskingum County Defendants*, p. 9, Doc. No. 40 ("*Memo. Contra*"). Plaintiff also argues in the alternative, contending that defendants

violated his rights as a convicted prisoner under the Eighth Amendment. *Id.* at 11-12. Conversely, defendants take the position that plaintiff was a convicted prisoner and therefore that a heightened standard applies to his claims of excessive force. *Motion for Summary Judgment*, pp. 9-10; *Reply in Support of Motion for Summary Judgment by Muskingum County Defendants*, pp. 4-5, Doc. No. 41 ("*Reply*").

In his deposition, plaintiff responded to questions regarding the circumstances of his incarceration:

> Q: Why were you incarcerated in Muskingum County from February of 2006 to approximately late April 2006?
>
> A: B&E.
>
> Q: Were you waiting for a court appearance while you were there or were you already in jail on another charge, if you know?
>
> A: I was down here.[11]
>
> Q: So you were transferred there to basically face other charges that were pending?
>
> A: Yes, sir.
>
> Q: And when you were done with that you were going to return to Ross?
>
> A: Yes, sir.
>
> Q: And so you returned to Ross Correctional after being in Muskingum County; correct?
>
> A: Yes, sir.

*Plaintiff Depo.*, p. 78. This testimony establishes that plaintiff was a convicted prisoner at the time of the incident. Accordingly, the

---

[11]The Court notes that plaintiff's deposition was conducted at RCI. *Plaintiff Depo.,* p.1.

Eighth Amendment applies to plaintiff's excessive force claims.[12]

The Eighth Amendment, which applies to the states through the Due Process Clause of the Fourteenth Amendment, *Robinson v. California*, 370 U.S. 660, 666 (1962), prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes.  U.S. Const. amend. VIII.  "The [United States] Supreme Court has cautioned against the expansive application of the Eighth Amendment in the prison context." *Caldwell v. Woodford Cty. Chief Jailer*, 968 F.2d 595, 601 (6th Cir. 1992).

In *Hudson v. McMillian*, 503 U.S. 1 (1992), the Supreme Court "set forth the standard for analyzing excessive force claims under the Eighth Amendment: 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Combs v. Wilkinson*, 315 F.3d 548, 556 (6th Cir. 2002) (quoting *Hudson*, 503 U.S. at 7).  This claim contains both a subjective and objective component.  *Moore v. Holbrook*, 2 F.3d 697, 700 (6th Cir. 1993).  "The subjective component provides that the offending, non-penal conduct be wanton." *Id.  See also Hardy v. Vieta*, No. 05-1024, 174 Fed. Appx. 923, 925 (6th Cir. April 4, 2006) ("Pain inflicted in the complete absence of penological justification is, by definition, unnecessary and wanton.").  "[A]n Eighth Amendment claimant can satisfy this heightened subjective requirement by proving that prison officials 'used force with a knowing willingness that [harm will] occur.'" *Hasenmeier-McCarthy v. Rose*, 986 F. Supp. 464, 470-71 (S.D. Ohio 1998) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835

---

[12]Therefore, any claims predicated on plaintiff's pretrial detainee status are without merit.

16

(1994)).  Factors in the determination of whether the use of force was wanton and unnecessary include the extent of injury suffered by an inmate, the need for application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response.  *Combs*, 315 F.3d at 556 (quoting *Hudson*, 503 U.S. at 7); *Hardy*, 174 Fed. Appx. at 925.

"The objective component of an Eighth Amendment claim requires that the pain be serious."  *Moore*, 2 F.3d at 700.  This component is "contextual and responsive to 'contemporary standards of decency.'"  *Hudson*, 503 U.S. at 8 (quoting *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)).  Therefore, "[t]he Eighth Amendment's prohibition of cruel and unusual punishment necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to the conscience of mankind.'"  *Id*. at 9-10.

"Because prison officials 'must make their decisions in haste, under pressure, and frequently without the luxury of a second chance,' we must grant them 'wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.'"  *Combs*, 315 F.3d at 557 (quoting *Hudson*, 503 U.S. at 6).  A court's retrospective analysis "must be carefully circumscribed to take into account the nature of the prison setting in which the conduct occurs and to prevent a prison official's conduct from being subjected to unreasonable *post hoc* judicial second-guessing."  *Parrish v. Johnson*, 800 F.2d 600, 605 (6th Cir.

17

1986) (citing *Whitley v. Albers*, 475 U.S. 312, 322 (1986)).

### 3. Discussion

Plaintiff alleges "three separate" violations of the Eighth
Amendment, including electroshock, asphyxiation and resort to the
restraint chair. *Memo. Contra*, p. 12; *Am. Comp.* ¶¶ 32-42, 139-144.
In moving for summary judgment on these claims, defendants raise a
qualified immunity defense. *Motion for Summary Judgment*, pp. 10-11.
"The affirmative defense of qualified, or good faith, immunity shields
'government officials performing discretionary functions . . . from
[Section 1983] liability for civil damages insofar as their conduct
does not violate clearly established statutory or constitutional
rights of which a reasonable person would have known.'" *Pearson v.
Callahan,* __ U.S. __, 129 S.Ct. 808, 815 (2009) (quoting *Harlow v.
Fitzgerald*, 457 U.S. 800, 818 (1982)). "An official may, however, be
held personally liable for civil damages for unlawful official action
if that action was not objectively reasonable in light of the legal
rules that were 'clearly established' at the time it was taken."
*Gardenhire v. Schubert,* 205 F.3d 303, 311 (6th Cir. 2000) (citing
*Anderson v. Creighton*, 483 U.S. 635, 639 (1987)). "This 'objective
legal reasonableness' standard analyzes claims of immunity on a
fact-specific, case-by-case basis to determine whether a reasonable
official in the defendant's position could have believed that his
conduct was lawful, judged from the perspective of the reasonable
official on the scene." *Id.* (citing *Graham v. Connor*, 490 U.S. 386,
396 (1989)). The defense of qualified immunity protects a government
official whether the official's error was "a mistake of law, a mistake
of fact, or a mistake based on mixed questions of law and fact."

*Pearson*, 129 S.Ct. at 815 (quoting *Groh v. Ramirez,* 540 U.S. 551, 567 (2004) (Kennedy, J., dissenting)).

Ordinarily, application of the doctrine of qualified immunity requires the initial determination whether the plaintiff has alleged a deprivation of a constitutional right and, if so, whether that right was clearly established. *Pearson*, 129 S.Ct. at 815-18.[13] When determining whether a right is "clearly established," this Court must look first to decisions of the Supreme Court, then to the Sixth Circuit and other courts within this circuit, and finally to decisions of other circuits. *See Daugherty v. Campbell*, 935 F.2d 780, 784 (6th Cir. 1991). "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Gardenhire*, 205 F.3d at 311 (citing *Creighton*, 483 U.S. at 640). However, "this not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Creighton*, 483 U.S. at 640 (citations omitted).

With this framework in mind, the Court turns to the question of whether defendants Van Dyne, Lang, Paxton, Duemmle and Rice are entitled to summary judgment on these excessive force claims on the basis of qualified immunity.

a. **Excessive force as to use of the taser (Counts 1 and 11)**

Plaintiff alleges that defendant Van Dyne acted "intentionally,

---

[13]*Pearson* also held, however, that this analysis is not to be applied inflexibly. *Id.*

negligently, with deliberate indifference to, and callous and wanton disregard for" plaintiff's Eighth Amendment rights when he used the taser against plaintiff "for the very purpose of causing harm or with a knowing willingness that harm would occur." *Am. Comp.* ¶¶ 34-35. Plaintiff further alleges that defendants Lang, Paxton, Duemmle and Rice "failed to intervene" even though they "observed the use of excessive force and had the means and opportunity to prevent the harm from occurring." *Id.* at ¶¶ 36.

### (1)   Defendant Van Dyne

As discussed *supra*, the following facts are undisputed. Defendant Van Dyne, in the company of defendants Lang, Paxton, Duemmle and Rice, twice ordered plaintiff to exit his cell to clean up a food tray on the floor near plaintiff's cell.  Plaintiff refused.  After at least two defendants entered his cell, plaintiff pushed away and tried to back up further into his cell.  Once defendants removed him from the cell, plaintiff grabbed steel bars outside his cell.  Plaintiff was ordered at least once to let go of the bars, but he refused. Defendant Van Dyne warned plaintiff that the taser would be used if plaintiff did not release the bars, but plaintiff still refused to comply.  Although the parties do not agree whether the taser was used four times or six times, it is undisputed that defendant Van Dyne used the taser several times against plaintiff.

Testifying regarding the application and effects of the taser, plaintiff stated the following:

> Q:   So you didn't let go of the bars because of the taser
>      but because the deputies were pulling you off?
>
> A:   Yes, sir.  And I believe they used extra force because
>      I believe the taser gun was ineffective.  So they used

another restraining method.

Q:  So you don't believe that the taser was effective that
    day?

A:  I mean apparently -- because they thought I was going
    to drop to the ground when I got shot with it, but I
    was still holding my ground and holding on the bars.
    They shot me six times and they knew that wasn't going
    -- that's not helping the situation.

Q:  The taser was not going to get you off those bars?

A:  Yes, sir.

*              *              *              *

Q:  And how long were the taser applications, if you know?

A:  I believe like ten seconds, ten seconds for each one.

Q:  Did you hear anything when the taser was applied to
    you?

A:  Yes, sir.

Q:  What did you hear?

A:  (Indicating), like normal taser sounds, like a
    zapping.

*              *              *              *

Q:  Did it hurt [when the taser was applied]?

A:  I mean, I felt the effect if that's what you're
    asking.

Q:  Did it hurt when the taser was applied to you?

A:  Yes, it did, but *I wasn't showing them it was hurting
    me.  I wasn't letting it known to them that it was
    really hurting me*, you know what I mean?

*Plaintiff Depo.*, pp. 55-58, 60 (emphasis added).  These undisputed

facts, construed in a light most favorable to plaintiff, did not give

rise to a violation of plaintiff's constitutional right.

Plaintiff complains, first, that his conduct did not justify any

use of force by jail officials.  He denies throwing his food and tray

21

and asserts that there was "minimal provocation by Plaintiff." *Memo. Contra*, pp. 12-13. Plaintiff further argues that defendants "have not adequately proven that Plaintiff's conduct constituted any perceivable safety risks to himself or others." *Id.* These arguments are utterly without merit. It is undisputed that plaintiff refused to obey several commands to clean up the food tray, to exit his cell and to release his grip on the bars. "The jail has a legitimate interest in having inmates obey orders. 'Inmates cannot be permitted to decide which orders they will obey, and when they will obey them. Someone must exercise authority and control.'" *Caldwell*, 968 F.2d at 601 (quoting *Soto v. Dickey*, 744 F.2d 1260, 1270 (7th Cir. 1984)).

As discussed *supra*, the question is whether a reasonable official in defendant Van Dyne's position could have believed that his conduct was lawful, judged from the perspective of the reasonable official on the scene. *See Gardenhire*, 205 F.3d at 311. At the time of the incident, defendant Van Dyne had been employed by the Muskingum County Sheriff's Office for approximately ten years and was certified in the use of a taser. *Affidavit of Robert Van Dyne*, ¶ 2, attached as Exhibit 3 to *Motion for Summary Judgment* ("*Van Dyne Aff.*"); *Van Dyne Depo.*, pp. 5, 7. He knew that a taser should not be used for punishment. *Van Dyne Depo.*, p. 8; *Van Dyne Aff.* ¶ 11. Defendant Van Dyne was also aware of the danger associated with a physical struggle with an inmate. *See Van Dyne Aff.* ¶ 8. Judged from the perspective of a reasonable official on the scene, where plaintiff had repeatedly disobeyed lawful, direct orders, the use of the taser was warranted. *See*, *e.g.*, *Caldwell*, 968 F.2d at 601.

Second, there is no evidence that the taser shots were

22

unnecessary or disproportionate to the need to use force.  Defendants
first attempted to gain plaintiff's compliance through verbal
commands.  Defendants also tried -- unsuccessfully -- to physically
remove plaintiff from his cell and to break his grip on the bars.
Plaintiff's own testimony establishes that defendants struggled with
him for ten minutes before resorting to administration of the taser.
Plaintiff was warned that a taser would be used, but he still refused
to comply with the officers' orders.  Defendant Van Dyne had exhausted
all options available to him to control plaintiff before applying the
taser.  The Court will not second guess defendant Van Dyne's actions
under these circumstances.  *See Parrish*, 800 F.2d at 605.  *See*, *e.g.*,
*Caldwell*, 968 F.2d at 601 (finding no constitutional violation when
taser was used against inmate).

In addition, defendant Van Dyne used the taser multiple times
because he (and defendant Lang) did not see a change in plaintiff's
behavior after the first application.  In fact, plaintiff admitted
that he purposely refrained from showing any reaction to the taser.
Therefore, by plaintiff's own admission, it was impossible for
defendants to observe or detect that the taser, whether used four
times or six times, had any effect whatsoever on plaintiff.[14]  Under
these circumstances, plaintiff cannot establish that the use of the
taser was either unnecessary or wanton; moreover, plaintiff cannot
establish the subjective component of his claim.  Accordingly, the

---

[14]The Court notes that there is some disagreement in the record as to
whether or not the taser was working properly when applied to plaintiff.
However, the Court concludes that, even if the taser was working properly,
plaintiff -- who concedes that his behavior suggested that the taser was not
working properly -- cannot establish the subjective component of his claim of
excessive use of force.

Court concludes that defendant Van Dyne's use of the taser was a good faith effort to restore discipline and did not violate plaintiff's rights.

### (2) Defendants Lang, Paxton, Duemmle and Rice

Plaintiff also alleges that defendants Lang, Paxton, Duemmle and Rice observed defendant Van Dyne maliciously use the taser and violated plaintiff's Eighth Amendment rights when they failed to intervene. *Am. Comp.* ¶¶ 36-37.

An officer who is present when another officer uses improper force and who fails to intervene may be held liable for excessive force under § 1983. *See, e.g., Bruner v. Dunaway*, 685 F.2d 422, 426 (6th Cir. 1982) ("[I]t is not necessary, in order to hold a police officer liable under § 1983, to demonstrate that the officer actively participated in striking a plaintiff."). *See also McHenry v. Chadwick*, 896 F.2d 184, 188 (6th Cir. 1990) ("Applying *Bruner* to the prison context, a correctional officer who observes an unlawful beating may, nevertheless, be held liable under § 1983 without actively participating in the unlawful beating.").

As discussed *supra*, defendant Van Dyne's application of the taser was not improper. It cannot be said, then, that defendants Lang, Paxton, Duemmle and Rice observed an unconstitutional act. Because defendant Van Dyne engaged in only a good faith application of force to restore discipline, these other defendants had no duty to intervene. Accordingly, the *Motion for Summary Judgment* is **GRANTED** as to the excessive force claims premised on the use of the taser (Counts 1 and 11).

### b. Excessive force as to alleged asphyxiation

24

**(Counts 2 and 12)**

Plaintiff also alleges that defendants Van Dyne, Lang, Paxton, Duemmle and Rice "acted intentionally, negligently, with deliberate indifference to, and callous and wanton disregard for, Plaintiff Fletcher's Eighth Amendment rights, by choking Plaintiff Kenneth Fletcher until he was unconscious." *Am. Comp.* ¶¶ 40, 100. Plaintiff further alleges that these defendants "failed to intervene to prevent other officers from violating Plaintiff Fletcher's constitutional rights by asphyxiating Plaintiff Fletcher to the point of unconsciousness." *Id*. at ¶¶ 41, 101.

The parties disagree whether plaintiff was choked or asphyxiated and whether he suffered a period of unconsciousness. Plaintiff testified that "[a] dude put a choke hold on me while a dude was trying to get my fingers off the bar" and that "the dude was jerking me off by the neck." *Plaintiff Depo.*, pp. 53-54. Plaintiff further testified that he lost consciousness after one of the defendants placed him in a tight head lock; plaintiff testified that he was not conscious when he was transported to the restraint chair:

> Q: After they got you off the bars the second time how much time are we taking about?
>
> A: Well, it took them like ten minutes just to pull me off the first time. Then I had regrouped. It was probably another ten minutes and I woke up in the restraint chair. I woke up and I was strapped down to the restraint chair for hours.
>
> Q: Do you know how you were transported to the restraint chair?
>
> A: No, I don't.
>
> Q: Do you have any recollection of walking down Center Range, getting on the elevator and then going to the restraint chair?

A:    No, sir.

\*                \*                \*                \*

Q:    What is the last thing you recall before you lost
      consciousness?

A:    That I was on the ground but I was still holding the
      bars.  Like I was lying down on the floor holding the
      bars and they were kicking me, punching me in my side,
      kicking me in my side.  And a dude was on top of me,
      doing the head lock.  He put- when I slid down the
      pole, he managed to get a better hold around my neck
      and managed to apply a tight head lock around me
      because when he was grabbing me I could feel like I
      was going- you know how like right when you- right
      when you're ready to pass out you feel a little woozy.
      I started losing a little of my strength.  I was
      coming down to the ground and I was still holding the
      bars.  I just remember them kicking me and punching me
      in my sides.  That's when I woke up in the restraint
      chair.

*Plaintiff Depo.*, pp. 58-61.

On the other hand, defendants Van Dyne and Lang deny that
plaintiff was choked or was rendered unconscious.  They testified that
plaintiff walked on his own after he was removed from the bars.  *Van
Dyne Depo.*, p. 50; *Lang Depo.*, p. 31.

Regardless, however, the Court concludes that defendants Van
Dyne, Lang, Paxton, Duemmle and Rice are entitled to summary judgment
on plaintiffs' claims relating to these events.  As noted *supra,* jail
officials were entitled to use such force as was reasonable to control
plaintiff.  *See Caldwell,* 968 F.2d at 601.  As plaintiff's own
testimony makes clear, plaintiff continues to resist these defendants'
efforts to control him despite their use of force: even as he was
"ready to pass out," he "was still holding the bars."  *Plaintiff
Depo.,* p.61.  It simply cannot be said under these circumstances that
the level of force utilized against plaintiff was disproportionate to

26

the need for force.  Moreover, the fact that plaintiff may have lost consciousness for a period of time does not mean that the force used against him was excessive.

Accordingly, the *Motion for Summary Judgment* is **GRANTED** as to the excessive force claim based on asphyxiation (Counts 2 and 12).


### c.     Excessive force as to use of the restraint chair (Counts 19 and 20)

Plaintiff also alleges that defendants Paxton, Duemmle and Rice "acted intentionally, negligently, with deliberate indifference to, and callous and wanton disregard for, Plaintiff Fletcher's Eighth Amendment rights, by placing him in the restraint chair for five to six hours." *Am. Comp.* ¶¶ 141, 147.  Plaintiff further alleges that defendants Van Dyne and Lang "failed to intervene to prevent Defendant [sic] Duemmele, Rice, and Paxton from violating Plaintiff Fletcher's constitutional rights by restraining him for long periods." *Id.* at ¶¶ 143, 149.

The parties disagree on many of the facts surrounding plaintiff's placement in the restraint chair, including the justification for the placement in the chair and the length of time plaintiff spent in the chair.  A restraint chair may be properly used to restore control over an individual who is in custody or to prevent such an individual from harming himself.  *See, e.g., Fuentes v. Wagner,* 206 F.3d 335 (3d Cir. 2000); *Morrison v. Stephenson,* 2008 WL 114890, *3 (S.D. Ohio, January 9, 2008); *Pillette v. County of Otsego,* 2007 WL 851330, *9 (E.D. Mich., February 27, 2007).  In Muskingum County, an inmate may be

27

placed in a restraint chair if he is assaultive or destructive or if he refuses to comply with orders. *Newman Depo.,* p. 31. Defendant Lang testified that plaintiff was placed in the restraint chair because he "was combative and resistant to our commands." *Lang Depo.*, pp. 31-32. Defendant Newman concurred, testifying that plaintiff "was a threat to our staff because of his aggressive behavior. He was resisting, and that certainly is one of the reasons he can be placed in a restraint chair." *Newman Depo.*, pp. 31-32. Plaintiff, on the other hand, testified that he was unconscious when he was placed in the chair, *Plaintiff Depo.*, pp. 58-61, and was, presumably, not combative. *But see Wysong v. City of Heath,* 260 Fed. Appx. 848, 2008 WL 185798, *9 (6th Cir. Jan. 22, 2008).

This Court concludes that the record reflects genuine issues of material fact associated with plaintiff's placement in the restraint chair.

Moreover, the record also reflects genuine issues of material fact relating to the length of time that plaintiff spent in the restraint chair. Defendants contend that plaintiff was in the restraint chair for a total of approximately four hours, *Lang Depo.*, pp. 32-33, while plaintiff testified that it was closer to six hours. *Plaintiff Depo.*, pp. 59-60. Defendant Newman testified that he knows of no person kept in the chair longer than three hours. *Newman Depo.*, pp. 60-61. He estimated that the longest period of time someone has been in the restraint chair "[w]ithout being taken out or offered time to go to the restroom or anything, maybe an hour and a half to two hours. They can ask to go to the restroom if they want to, and they will be taken." *Id.* Defendant Van Dyne knows of no one kept in the

chair longer than two hours. *Van Dyne Depo.*, p. 57. Defendant Newman testified that plaintiff was temporarily removed from the chair after 1½ hours and was returned to the chair after becoming agitated again. *Newman Depo.,* pp. 52-59. Plaintiff made no mention in his deposition of a temporary release from the restraint chair.

Plaintiff also testified that, while he was confined in the restraint chair, he requested medical treatment for taser burns, but that defendants denied his request. *Plaintiff Depo.,* pp. 63-65. Conversely, defendant Lang testified that plaintiff made no mention of any injury and that defendants were unaware of any need for medical treatment. *Lang Depo.*, pp. 33-34. According to defendant Newman, plaintiff did not ask for medical attention. *Newman Aff.* ¶ 15.

In light of these disputes, the Court is compelled to conclude that there exist genuine issues of material fact as to whether plaintiff's placement in the restraint chair and the conditions surrounding his time in the restraint chair violated the Eighth Amendment. Accordingly, the *Motion for Summary Judgment* is **DENIED** as to plaintiff's claims against defendant Paxton, Duemmle, Rice, Van Dyne and Lang based on plaintiff's placement and time in the restraint chair (Counts 19 and 20).

### B. State Law Claim of Battery (Count 10)

Plaintiff alleges that "Defendants intentionally caused an unprivileged, un-consented to immediate offensive touching to Plaintiff Kenneth Fletcher" or exceeded the scope of their privilege "by electro-shocking him numerous times and strangling him into unconsciousness." *Am. Comp.* ¶¶ 87-88. Defendants argue that they are

entitled to immunity on these claims. *Motion for Summary Judgment*, pp. 27-28.

Plaintiff's battery claim is based on the same facts that underlie his Eighth Amendment claims, arising out of the force used to subdue plaintiff in the Center Range, including the use of the taser. Because, for the reasons stated *supra,* plaintiff's constitutional rights were not violated in connection with that use of force, the *Motion for Summary Judgment* is **GRANTED** as to plaintiff's battery claim (Count 10).

### C. Denial of Medical Care (Counts 7, 17)

Plaintiff alleges that defendants Van Dyne, Lang, Paxton, Duemmle and Rice violated his constitutional rights "by denying Plaintiff medical care for the serious medical injuries inflicted upon him by Defendants." *Am. Comp.* ¶¶ 61, 121.

"The Eighth Amendment's ban against cruel and unusual punishment obliges prison authorities to provide medical care for prisoners' serious medical needs." *Brooks v. Celeste*, 39 F.3d 125, 127 (6th Cir. 1994). In order to assert a cognizable claim in this regard, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). A claim of denial of medical care under the Eighth Amendment contains a subjective and an objective component. *Wilson v. Seiter*, 501 U.S. 294, 298-300 (1991). Under the objective component, an inmate plaintiff's medical needs must be "sufficiently serious."

*Id.; Farmer v. Brennan*, 511 U.S. 825, 834 (1994). "A serious medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Harrison v. Ash*, 539 F.3d 510, (6th Cir. 2008) (quoting *Blackmore v. Kalamazoo County*, 390 F.3d 890, 897 (6th Cir. 2004)). "The subjective component, in contrast, requires a plaintiff to 'allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk.'" *Dominguez v. Corr. Med. Servs.*, 555 F.3d 543, 550 (6th Cir. 2009) (quoting *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)). Finally, "where the prisoner has received some medical attention and now disputes the adequacy of that treatment, the federal courts are reluctant to second-guess prison officials' medical judgments and to constitutionalize claims which sound in state tort law." *Lewis v. McClennan*, No. 00-5755, 7 Fed. Appx. 373, 375 (6th Cir. Mar. 20, 2001) (citing *Westlake v. Lucas*, 537 F.2d 857, 860 n.5 (6th Cir. 1976)).

The parties disagree whether plaintiff's alleged injuries were sufficiently serious, whether he was denied medical treatment and whether defendants Van Dyne, Lang, Paxton, Duemmle and Rice had a sufficiently culpable state of mind.

As to his injuries, plaintiff testified that his back and side were "aching" because of the alleged punches and kicks received during the physical altercation with defendants Van Dyne, Lang, Paxton, Duemmle and Rice. *Plaintiff Depo.*, pp. 63-64, 69. Plaintiff also

testified that the taser burned his back and that he ultimately contracted a staph infection and experienced scarring from the taser. *Id*. at 64-66, 68, 70.[15]  Plaintiff further testified that he sought psychological treatment as a result of the incident on April 21, 2006. *Id*. at 90-91.  Plaintiff also testified that, although he requested medical treatment while he was in the restraint chair, his requests were denied.

In contrast, defendants Lang and Newman averred that plaintiff requested no medical treatment from them.  *Lang Depo.,* p. 34; *Newman Aff.,* ¶15.  The use of force report prepared by defendant Van Dyne and approved by defendant Lang after the incident indicated that plaintiff suffered no injuries.  *Van Dyne Depo.*, pp. 62-63; *Lang Depo.*, pp. 36-37.  Yet, defendants Van Dyne and Lang testified that neither they nor medical personnel examined plaintiff for injuries after the altercation and before plaintiff was placed in the restraint chair. The day after the incident, MCJ Supervisor Whiteman examined plaintiff and observed taser marks on plaintiff's back, but concluded that they "did not look infected and they did not look like they required medical attention."  *Whiteman Aff.* ¶ 6.  At plaintiff's request, Supervisor Whiteman provided antibiotic cream and band-aids.  *Id.,* ¶¶ 7-8.  Plaintiff denied receiving antibiotic cream.  *Plaintiff Depo.,* pp. 62-63.

Defendants also offer the affidavit and report of a medical

---

[15]In his memorandum *contra* defendants' motion, plaintiff asserts that he suffered blisters and puncture wounds from the taser.  *Memo. Contra*.  The Court's review of the record reveals no evidence to support this assertion. Plaintiff himself made no reference in his deposition to blisters or puncture wounds.

expert, Donald Dawes, M.D., F.A.C.E.P., attached as Exhibit 5 to *Motion for Summary Judgment* ("*Dawes Report*"). Dr. Dawes apparently premises at least a portion of his opinion on defendants' version of the facts. *Id*. at 2, 4 (accepting defendants' factual contention that the taser was applied four, rather than six, times to plaintiff "in the drive-stun mode"). Dr. Dawes also based his opinion on photographs[16] of plaintiff's body that were of "poor quality." *Id*. at 4. Nevertheless, Dr. Dawes commented that plaintiff "received superficial burns to his lower back that, in the immediate period, were minor requiring nothing more than simple self-wound care." *Id*. at 13. Dr. Dawes opined there was no evidence of infection:

> The records indicate the nurse ordered an antibiotic ointment. This does not indicate an infection per se. Medical providers commonly do this with burns to prevent an infection. The medical literature is equivocal on whether this practice is even useful. It would certainly not fall below the standard of care to not prescribe an antibiotic ointment for small surface area and superficial partial thickness burns. . . . The wound photographs reviewed do not show evidence of an infection. These wounds are consistent with drive-stun wounds at 24-48 hours. There are areas of reactive erythema and some areas of blistering with fibrinous exudates. This white discharge is often confused by the lay-person for 'pus' but it is not a sign of infection.

*Id*. at 4.[17]

The opinion of Dr. Dawes does not resolve the factual dispute in defendants' favor.

---

[16]Copies of these photographs and medical records were not provided to the Court.

[17]Dr. Dawes also attached to his report "two photographs of volunteers who received 5-second discharges from a TASER X26 in the drive-stun mode." *Dawes Report*, p. 4, *Attachments*. However, only black and white paper photocopies of these photographs were filed with the Court. The quality of these copies is so poor as to be useless to the Court.

On the present record, the Court is compelled to conclude that there exist genuine issues of material fact as to whether plaintiff suffered a sufficiently serious injury, whether he requested and was denied medical treatment and whether defendants had a sufficiently culpable state of mind to give rise to a constitutional claim for denial of medical care.  Accordingly, the *Motion for Summary Judgment* is **DENIED** as to the claims based on denial of medical care (Counts 7 and 17) against defendants Van Dyne, Lang, Paxton, Duemmle and Rice.

### D.    RLUIPA Claim (Count 9)

#### 1.    Standard

Plaintiff alleges that defendants violated his rights under RLUIPA.  *Am. Comp.* ¶¶ 79-85.  RLUIPA prohibits governmental imposition of a "substantial burden on the religious exercise" of an inmate unless the government establishes that the burden furthers a "compelling governmental interest" through the "least restrictive means[.]"  42 U.S.C. § 2000cc-1(a).  "RLUIPA thus protects institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion."  *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005).

"The threshold inquiry under RLUIPA is whether the challenged governmental action substantially burdens the exercise of religion." *Baranowski v. Hart*, 486 F.3d 112, 124 (5th Cir. 2007).  Therefore, the plaintiff bears the initial burden of establishing that the challenged action "substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc-2(b); *Dunlap v. Losey*, No. 01-2586, 40 Fed. Appx.

34

41, at *43 (6th Cir. May 15, 2002). *See also Sanders v. Ryan*, 484 F. Supp.2d 1028, 1034 (D. Ariz. 2007). If the plaintiff carries this burden, the government must then establish that that substantial burden is the least restrictive means of furthering a compelling governmental interest. 42 U.S.C. §§ 2000cc-1(a), 2000cc-2(b).

"Religious exercise" "includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). "The 'exercise of religion' often involves not only belief and profession but the performance of . . . physical acts [such as] assembling with others for a worship service [or] participating in sacramental use of bread and wine . . . ." *Cutter*, 544 U.S. at 720 (quoting *Employment Div. v. Smith*, 494 U.S. 872, 877 (1990) (internal citations omitted)). The parties in this case do not dispute that refraining from eating pork in accordance with the Muslim faith constitutes a "religious exercise" under RLUIPA.

Neither RLUIPA nor the United States Supreme Court has defined the term "substantial burden" as it relates to a religious exercise by an incarcerated person under the statute. However, the Sixth Circuit, in a land use zoning context,[18] has held that a "substantial burden" on the exercise of religion exists where an individual must choose between "following the precepts of her religion and forfeiting benefits[.]" *Living Water Church of God v. Charter Twp. of Meridian*, Nos. 05-2309 and 06-1210, 258 Fed. Appx. 729, at *735, 737 (6th Cir. Dec. 10, 2007) (relying on Supreme Court jurisprudence regarding the

---

[18]RLUIPA's zoning provisions are facially similar to the provisions protecting the religious exercise by institutionalized persons. *See* 42 U.S.C. § 2000cc(a)(1).

First Amendment's "free exercise" clause) (internal citations omitted). Similarly, a "substantial burden" is one that places "substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Id.* (internal citations omitted).

On the other hand, government action that simply encumbers religious exercise by making it more expensive or difficult does not constitute a "substantial burden." *Id.* at *735-37. *See also Reischauer v. Jones*, No. 2:06-CV-149, 2009 U.S. Dist. LEXIS 6358, at *21 (W.D. Mich. Jan. 29, 2009) ("A burden is less than 'substantial' where it imposes merely an 'inconvenience on religious exercise,' or does not 'pressure the individual to violate his or her religious beliefs.'") (citations omitted). Likewise, isolated or sporadic government action or omission that is merely *de minimis* does not qualify as a "substantial burden." *Dunlap*, 40 Fed. Appx. at *43. *Accord Furnace v. Sullivan*, No. C 07-4441, 2008 U.S. Dist. LEXIS 93464, at *9-10 (N.D. Cal. Nov. 10, 2008); *Talbert v. Jabe*, No. 7:07-cv-00450, 2007 U.S. Dist. LEXIS 82962, at *60 (W.D. Va. Nov. 8, 2007); *Thompson v. Quarterman*, No. V-01-01, 2007 U.S. Dist. LEXIS 73207, at *6 (S.D. Tex. Sept. 30, 2007); *Welch v. Talmadge*, No. 05-CV-07387, 2006 U.S. Dist. LEXIS 70387, at *22-23 (E.D. Pa. Sept. 8, 2006).

Finally, "[a]lthough RLUIPA itself contains no state-of-mind standard, a fault requirement consistent with Congress's purpose must be incorporated from customary tort principles." *Lovelace v. Lee*, 472 F.3d 174, 194 (4th Cir. 2006). Accordingly, simple negligence is not actionable under RLUIPA. *Id.*

## 2. Discussion

Plaintiff has sued the eight individual defendants in their individual and official capacities. *Am. Comp.* The Court initially notes that it is unsettled whether RLUIPA creates a private cause of action against defendants in their individual capacities. Several courts, including sister courts in the Sixth Circuit, have concluded that RLUIPA does not permit individual capacity claims. *See, e.g.,* *Smith v. Allen*, 502 F.3d 1255, 1274-75 (11th Cir. 2007) (stating that the plaintiff "is not entitled to pursue a claim against these defendant-appellees in their individual capacities under section 3 of RLUIPA"); *Pugh v. Goord*, 571 F. Supp. 2d 477, 507 (S.D. N.Y. 2008); *Sisney v. Reisch*, 533 F. Supp. 2d 952, 967 (D. S.D. 2008); *Garrison v. Dutcher*, No. 1:07-CV-642, 2008 U.S. Dist. LEXIS 90504, at *12-13 (W.D. Mich. Sept. 30, 2008) ("The Court is persuaded by the reasoning of the [United States Court of Appeals for the] Eleventh Circuit and concludes that RLUIPA does not authorize individual-capacity claims."); *Horacek v. Burnett*, No. 07-11885, 2008 U.S. Dist. LEXIS 80477, at *2 (E.D. Mich. Sept. 30, 2008) (granting summary judgment as to RLUIPA claims against the defendant in his personal capacity). However, other courts, including a district court in the Sixth Circuit, have permitted individual capacity claims to proceed under RLUIPA. *See Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008); *Williams v. Bitner*, 455 F.3d 186, 194 (3d Cir. 2006); *Farnsworth v. Baxter*, No. 03-2950, 2007 U.S. Dist. LEXIS 72209, at *6 (W.D. Tenn. Sept. 26, 2007).[19]

---

[19] The Court also notes that the Sixth Circuit has not definitively ruled on whether damages are available under RLUIPA. However, for purposes of summary judgment, the Court will assume, without deciding, that money damages are available against defendants under this statute.

The Court need not decide this issue today because it concludes that plaintiff's RLUIPA claims fail for other reasons. Plaintiff alleges that defendants violated RLUIPA when they refused "to serve non-pork based products multiple times in the same week to Plaintiff." *Am. Comp.* ¶ 82. More specifically, plaintiff argues that he was served pork ham on April 16, 2006; on April, 21, 2006, "[p]laintiff was again served what *he believed* to be pork-based bologna." *Memo. Contra*, p. 23 (emphasis added). Plaintiff contends that defendants dismissed his complaints regarding pork and "then assaulted, choked, and applied the TASER to Plaintiff out of agitation due to Plaintiff's being a Muslim." *Id.* Plaintiff also alleges that defendant Fuller told him that he was "a disgrace to the white race." *Am. Comp.* ¶¶ 19, 84; *Memo. Contra*, p. 23.

Defendants deny that any pork-based products are served in MCJ and specifically deny that plaintiff was served pork in April 2006. *Motion for Summary Judgment*, pp. 26-27 (citing *Affidavit of Rose Donelson*, attached as Exhibit 2 to *Motion for Summary Judgment* ("*Donelson Aff.*")). In support of their position, defendants present the affidavit of Rose Donelson, MCJ's Food Service Director, who is responsible for ordering all food served at MCJ. *Donelson Aff.* ¶¶ 2-3. According to Ms. Donelson, MCJ "does not serve pork products or any beef products. The reason for this policy is so that the Jail can serve all inmates with the same food products, regardless of their religious beliefs." *Id.* at ¶ 4. In addition, Ms. Donelson examined the menus for the dates at issue in this case, confirming that turkey "ham" was served on April 16, 2006 and that turkey "bologna" was

served on April 21, 2006.[20]  *Id*. at ¶¶ 5-7.

Defendants' arguments are well-taken.  Plaintiff offers no evidence but his own unsupported speculation that he was served pork while incarcerated at MCJ.  *See Memo. Contra*, pp. 23-24.[21]

Plaintiff also complains that defendant Fuller told him that he was "a disgrace to the white race."  *Id.* (citing *Plaintiff Depo.*, p. 70).  Defendant Fuller denies making this statement.  *Deposition of Erin Lynn Fuller*, p. 19, Doc. No. 37 ("*Fuller Depo.*").  However, even accepting plaintiff's allegation as true, there is no evidence that this comment substantially burdened plaintiff's religion.  Plaintiff's contention that the comment "verbally degraded" him does not amount to a substantial burden under RLUIPA.

Plaintiff also argues that he was "unfairly disciplined" because of his religion.  *Memo. Contra*, p. 23.  However, the deposition testimony cited in support of this argument, *Plaintiff's Depo.,* pp. 100-101, refers to no events giving rise to the claims asserted in this action, indeed that portion of plaintiff's deposition makes no mention whatsoever of defendants.

Under these circumstances, the Court concludes that the uncontroverted evidence establishes that plaintiff was not served pork products, nor was he disciplined on account of his Muslim religion. Because plaintiff has not carried his initial burden of establishing a

---

[20]Defendants also submitted copies of the labels for the turkey "ham" and "bologna" that were served on April 16 and 21, 2006.  *See* Exhibits A and B, attached to *Donelson Aff*.

[21]Plaintiff does rely on two excerpts from his deposition testimony, but the cited testimony does not stand for the proposition for which it is cited.

"substantial burden" on his religious exercise, his claims under RLUIPA must fail. *See* 42 U.S.C. § 2000cc-1(a); *Baranowski*, 486 F.3d at 124. Accordingly, the *Motion for Summary Judgment* is **GRANTED** as to the RLUIPA claim (Count 10) against all defendants in its entirety.

### E. Unconstitutional Law, Custom and Policy and Failure to Train (Counts 3, 4, 5, 6, 8, 13, 14, 15, 16, 18, 21, 22, 23)

Plaintiff alleges that the defendant County pursued a policy and/or procedure "to use force maliciously and sadistically and for the very purpose of causing harm or with a knowing willingness that harm would occur." *Memo. Contra*, p. 19. Plaintiff also alleges that the County failed to properly train the individual defendants, thereby causing the unlawful acts and practices about which plaintiff complains. *Id*. at 21-22. Defendants seek summary judgment on these claims.

A local government may be held liable for the claimed constitutional tort of its employee only if the tort was caused by a policy or custom of the governmental employer. *See Monell v. New York City Dep't of Soc. Serv.*, 436 U.S. 658, 690 (1978). The theory of *respondeat superior* may not serve as a basis for liability under 42 U.S.C. §1983. *Id*. at 691. In order to prevail on a claim against a governmental agency, a §1983 plaintiff has the burden of identifying the improper policy or custom that allegedly caused the particular injury of which the plaintiff complains:

> Municipalities are not, however, liable for every misdeed of their employees and agents. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." [*Monell*, 436 U.S. at ] 694. This circuit has stated that to

40

satisfy the *Monell* requirements a plaintiff must "identify
the policy, connect the policy to the city itself and show
that the particular injury was incurred because of the
execution of that policy." *Coogan v. City of Wixom*, 820
F.2d 170, 176 (6th Cir. 1987) (adopting the test articulated
in *Bennett v. City of Slidell*, 728 F.2d 762, 767 (5th Cir.
1984) (*en banc*).

*Garner v. Memphis Police Dep't*, 8 F.3d 358, 363-64 (6th Cir. 1993).

In the case *sub judice*, plaintiff contends that the improper
"policies and/or procedures have arisen by both adoption/ratification
and through custom and practice." *Memo. Contra*, p. 19.  Under *Monell*,
a custom is "so permanent and well settled as to constitute a custom
or usage with the force of law." *Monell*, 436 U.S. at 691 (internal
quotation marks and citation omitted).  "In turn, the notion of 'law'
must include deeply embedded traditional ways of carrying out state
policy." *Cash v. Hamilton County Dep't of Adult Prob.*, 388 F.3d 539,
543 (6th Cir. 2004) (quoting *Doe v. Claiborne County*, 103 F.3d 495,
507-08 (6th Cir. 1996) (internal quotation marks omitted)).  "It must
reflect a course of action deliberately chosen from among various
alternatives.  In short, a 'custom' is a 'legal institution' not
memorialized by written law." *Id*. (quoting *Doe*, 103 F.3d at 507-08).

"In addition to showing that [the County] as an entity 'caused'
the constitutional violation, plaintiff must also show a direct causal
link between the custom and the constitutional deprivation; that is,
[]he must 'show that the particular injury was incurred *because* of the
execution of that policy.'" *Doe*, 103 F.3d at 508 (quoting *Garner v.
Memphis Police Dep't*, 8 F.3d at 364 (emphasis added) (citation
omitted).

Plaintiff alleges that the County formulated a policy and/or
procedure to use excessive force, arising from formal adoption,

41

custom, or by failing to train the individual defendants. *Memo. Contra*, pp. 19-22. More specifically, plaintiff complains that this policy and/or procedure includes (a) utilizing the restraint chair "for periods in excess of two hours without water, bathroom breaks, or exercise breaks," (b) utilizing a taser "at least four times to an individual that [sic] resists nonviolently," and (c) "to choke its occupants until unconscious." *Memo. Contra*, p. 20. Plaintiff also complains that "[i]t is the policy of the Muskingum County Sheriff's Office to deny medical treatment to its occupants." *Id*.

However, plaintiff had not identified a formal or official policy adopted by the County approving the use of excessive force premised on resort to a restraint chair, taser or choking. Plaintiff offers only conclusory allegations of alleged policies or procedures, but offers no evidentiary support for those allegations and provides no citations to the record in connection with those allegations. *See Memo. contra*, p. 20. The deposition testimony to which plaintiff refers is either taken out of context or does not establish the facts for which it is cited. *Id*.[22]

Similarly, to the extent that plaintiff relies on allegations that the County failed to train the individual defendants, this argument is without merit.

_____

[22]For example, plaintiff argues that it is a policy of the Muskingum County Sheriff's Office to not "monitor individuals placed in the restraint chair for a prolonged period of time." *Memo. Contra*, p. 20 (citing *Van Dyne Depo.*, p. 56 and *Newman Depo.*, p. 52). However, defendant Van Dyne simply (1) testified at the cited portion of his deposition that he did not examine plaintiff before the latter was placed in the restraint chair, and (2) described at the cited portion of his deposition the features of the restraint chair. Similarly, defendant Newman testified that (1) the officer completing the use of force report should examine the inmate for injuries, and (2) that defendant Newman spoke with plaintiff while the latter was sitting in the restraint chair.

> [T]he inadequacy of police training may serve as the basis
> for § 1983 liability only where the failure to train amounts
> to deliberate indifference to the rights of persons with
> whom the police come into contact. . . . Only where a
> municipality's failure to train its employees in a relevant
> respect evidences a 'deliberate indifference' to the rights
> of its inhabitants can such a shortcoming be properly
> thought of as a city 'policy or custom' that is actionable
> under § 1983.

*City of Canton v. Harris*, 489 U.S. 378, 388-89 (1989).  The United

States Court of Appeals for the Sixth Circuit has held that only under

"narrow circumstances" may a municipality be held liable for failure

to train its officials:

> It may happen that in light of the duties assigned to
> specific officers or employees the need for more or
> different training is so obvious, and the inadequacy so
> likely to result in the violation of constitutional rights,
> that the policymakers of the city can reasonably be said to
> have been deliberately indifferent to the need. In that
> event, the failure to provide proper training may fairly be
> said to represent a policy for which the city is
> responsible, and for which the city may be held liable if it
> actually causes injury.

*Sell v. City of Columbus*, No. 00-4467, 47 Fed. Appx. 685, 691 (6th

Cir. Aug. 26, 2002) (quoting *City of Canton*, 489 U.S. at 390)).  In

this regard, "the focus must be on adequacy of the training program in

relation to the tasks the particular officers must perform." *City of

Canton*, 489 U.S. at 390.  Thus, allegations that an individual

defendant had been improperly trained is insufficient to establish

liability because the individual's "shortcomings may have resulted

from factors other than a faulty training program." *Id*. at 390-91.

Similarly, "[n]either will it suffice to prove that an injury or

accident could have been avoided if an officer had had better or more

training, sufficient to equip him to avoid the particular

injury-causing conduct." *Id*. at 391 (stating further that "adequately

43

trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable"). Accordingly, a plaintiff "must do more than point to something the [County] could have done to prevent the unfortunate incident." *Kahlich v. City of Grosse Pointe Farms*, No. 03-2060, 120 Fed. Appx. 580, 585 (6th Cir. Jan. 10, 2005).

Defendant Newman, who is familiar with the training provided to Muskingum County Sheriff's Officers, averred that "[a]ll Muskingum County Sheriff's Officers are required to attend the Ohio Peace Officers Training Academy (OPOTA) and be certified as a peace officer through testing before they may be employed with the Muskingum County Sheriff's Office." *Newman Aff*. ¶¶ 4-5. These officers are also required to take an additional 136-hour course at the Corrections Basics Academy, which includes several hours of self-defense and use of force training. *Id*. at ¶¶ 6-7. New hires within the Muskingum County Sheriff's Office receive training on office policies and procedures and receive further training as those policies and procedures are updated or amended. *Id*. at ¶¶ 8-9. In addition, Muskingum County Sheriff's Office employees annually undergo 24 hours of continuing education, which includes training on the use of force by Certified Use of Force Instructors and education on special inmate needs. *Id*. at ¶ 10.

Defendants also offer the report of Steve Ijames regarding defendants' training and use of force. Exhibit 4, attached to *Motion for Summary Judgment* ("*Ijames Report*"). Mr. Ijames, who has 29 years of "full time police experience," has "in depth knowledge [of] law enforcement resistance control and TASER technology[.]" *Id*. at 2. In

44

particular, Mr. Ijames states that the County's taser policy "is reasonable and well within the standards of contemporary and professional law enforcement agencies operating in the custody environment." *Id*. at 4. Mr. Ijames further reports that "the involved deputies were properly trained in general, and VanDyne in particular[.]" *Id*.

In response, plaintiff again primarily offers conclusory allegations that the defendant County's training program was inadequate. Although plaintiff does refer to a purported policy promulgated by the Ohio Department of Rehabilitation and Correction regarding "Physically Immobilizing Restraints," he has not submitted a copy of this policy or evidence of its authenticity. *See* F.R. Civ. P. 56(e)(1) ("if a paper ... is referred to in an affidavit, a sworn or certified copy must be attached to or served with the affidavit.") *See*, *e.g.*, *Fox v. Michigan State Police Dep't*, No. 04-2078, 173 Fed. Appx. 372, at *375 (6th Cir. Feb. 24, 2006) (affirming trial court's disregard of unauthenticated documents that were unsworn and uncertified and therefore inadmissible); *Lomax v. Sears, Roebuck & Co.*, No. 99-6589, 2000 U.S. App. LEXIS 33884, at *5 (6th Cir. Dec. 19, 2000) (noting that the district court properly concluded that audio tapes and related transcripts were inadmissible because they had not been authenticated). Plaintiff's summary of an alleged policy is inadmissible and will therefore be disregarded.

Viewing all the admissible evidence in a light most favorable to plaintiff, the Court concludes that plaintiff has failed to raise a genuine issue of material fact as to his claim of governmental liability based on unconstitutional policies or procedures.

Accordingly, the *Motion for Summary Judgment* is **GRANTED** as to claims premised on unconstitutional policies and/or procedures (Counts 3, 4, 5, 6, 8, 13, 14, 15, 16, 18, 21, 22, 23).[23]

**WHEREUPON**, *Motion for Summary Judgment by Muskingum County Defendants*, Doc. No. 34, is **GRANTED** in part and **DENIED** in part. Specifically, as the motion relates to:

1.   Counts 1 and 11 of the *Amended Complaint* (taser electroshock)[24] against defendants Van Dyne, Lang, Paxton, Duemmle and Rice, the *Motion for Summary Judgment* is **GRANTED**;

2.   Counts 2 and 12 of the *Amended Complaint* (asphyxiation) against defendants Van Dyne, Lang, Paxton, Duemmle and Rice, the *Motion for Summary Judgment* is **GRANTED**;

3.   Counts 19 and 20 of the *Amended Complaint* (restraint chair) against defendants Van Dyne, Lang, Paxton, Duemmle and Rice,

---

[23]Although it is unclear to the Court whether plaintiff asserts claims against individual defendants Newman and Stephenson for supervisor liability based upon a policy of inadequately training subordinates, *Am. Comp.* Counts 3, 4, 5, 6, 8, 13-16, 18, 21-23, the Court concludes that these defendants would nevertheless be entitled to summary judgment on these claims. First, plaintiff has offered no evidence in support of any such allegations. *Memo. Contra.* Because plaintiff may not simply rest upon the allegations in the pleadings, but must instead come forward with specific facts that show that there is a genuine issue for trial, *see Agristor Financial Corp. v. Van Sickle*, 967 F.2d at 236; Fed. R. Civ. P. 56(e), plaintiff has not met his burden.

Second, because a claim against a governmental employee in his official capacity is "only another way of pleading an action against an entity of which an officer is an agent," *Monell*, supra, 436 U.S. at 690 n.55, to the extent that the *Amended Complaint* asserts claims against defendants Newman and Stephenson in their official capacities, those claims cannot proceed for the reasons discussed *supra*. *See also Brandon v. Holt*, 469 U.S. 464, 471-72 (1983).

[24]As stated *supra*, any claims predicated on plaintiff's pretrial detainee status are dismissed.

the *Motion for Summary Judgment* is **DENIED**;

4.  Count 9 of the *Amended Complaint* (RLUIPA) against all defendants, the *Motion for Summary Judgment* is **GRANTED**;

5.  Count 10 of the *Amended Complaint* (common law battery) against all defendants, the *Motion for Summary Judgment* is **GRANTED**;

6.  Counts 7 and 17 of the *Amended Complaint* (denial of medical care) against defendants Van Dyne, Lang, Paxton, Duemmle and Rice, the *Motion for Summary Judgment* is **DENIED**;

7.  Counts 3, 4, 5, 6, 8, 13, 14, 15, 16, 18, 21, 22, 23 of the *Amended Complaint* (unconstitutional law, custom and policy and failure to train) against defendant Muskingum County, the *Motion for Summary Judgment* is **GRANTED**.


June 11, 2009                    *s/Norah McCann King*
                                 Norah M$^c$Cann King
                         United States Magistrate Judge